Lee M. BLEECKER, Plaintiff-Appellant,

v.

Terence P. CAHILL, Brewer & Cahill, LLP and
The Hanover Insurance Company,
Defendants-Respondents.

Court of Appeals

*No. 2016AP1231. Submitted on briefs January 13, 2017.
—Decided March 15, 2017.*

2017 WI App 28

(Also reported in 895 N.W.2d 72.)

On behalf of the plaintiff-appellant, the cause was submitted on the briefs of *J. Michael Riley* of *Axley Brynelson, LLP*, Madison.

On behalf of the defendants-respondents, the cause was submitted on the brief of *Eric D. Kaplan* of *Kaplan Papadakis & Gournis, P.C.*, Chicago, Illinois.

Before Neubauer, C.J., Gundrum and Hagedorn, JJ.

¶ 1. GUNDRUM, J.   Lee Bleecker appeals from the circuit court's grant of summary judgment to Terence P. Cahill, Brewer & Cahill, LLP and The Hanover Insurance Company.[1] He contends the court erred in concluding his legal malpractice claim was barred on the basis the statute of limitations began to run in 2003 when he signed a lease agreement on which Cahill advised him, as opposed to in 2013 when he incurred actual damages in relation to the agreement. We agree with Bleecker that his cause of action accrued in 2013 and this suit was timely filed; we reverse.

## Background

¶ 2.   In 2003, Lee Bleecker sought legal assistance from Attorney Terence Cahill in reviewing a lease between Bleecker and Aurora Medical Group, Inc., to build a clinic on Bleecker's land. Under the terms of the lease, Bleecker was to finance the construction costs and Aurora would reimburse Bleecker for those costs pursuant to an amortization schedule. Aurora agreed to an initial term of ten years with three, five-year options to extend the term of the lease. Bleecker claims he told Cahill it was very important that he recover all of his construction costs and Cahill assured him the lease would accomplish that. In contrast, Cahill claims he informed Bleecker the amortization payments would end if Aurora terminated the lease at the end of the initial term of ten years.

¶ 3.   The lease provided that "[i]n addition to Base Rent, during the initial 15 years of the Lease (including the first five-year renewal term), [Aurora]

---

[1] At times we will use "Cahill" to refer to Terence Cahill individually, and at times we will use it to refer to all three respondents collectively.

shall also pay to Landlord a monthly payment (the "Amortization Payment") determined by amortizing the total cost incurred in payments." The amortization clause also stated, "No Amortization Payment shall be due or payable after the first 180 months [15 years] *or such earlier date on which the Lease terminates.*" (Emphasis added.) Cahill faxed the final version of the lease to Bleecker, indicating his approval. In October 2003, Bleecker signed the lease without reviewing it.

¶ 4.   In 2013, Aurora informed Bleecker it was terminating the lease. Bleecker claims it was then that he first learned the lease permitted Aurora to terminate it at the end of the first term of ten years without being obligated to make the remaining amortization payments.

¶ 5.   In June 2014, Bleecker filed this lawsuit alleging Cahill had committed legal malpractice with regard to his legal assistance in 2003 and Bleecker incurred financial damage as a result. The circuit court granted Cahill summary judgment on the basis that Bleecker's claim accrued when the lease was signed in 2003, "before the ink was even dry," and thus the statute of limitations had run. Bleecker appeals, arguing the claim did not accrue until Aurora declined to extend the term of the lease in 2013 and with that was no longer obligated to make the amortization payments.[2]

---

[2] Bleecker also argued to the circuit court that his claim against Cahill did not accrue until 2013 because he did not discover Cahill's malpractice until that time. The circuit court ruled that Bleecker could not benefit from the discovery rule because he had not acted with reasonable diligence when he failed to read the lease before signing it in 2003. On appeal, Bleecker also argues the circuit court erred in ruling he could not benefit from the discovery rule. Because we conclude on

285

*Discussion*

¶ 6.   Our review of a circuit court's decision on summary judgment is de novo. *Behrendt v. Gulf Underwriters Ins. Co.*, 2009 WI 71, ¶ 11, 318 Wis. 2d 622, 768 N.W.2d 568. Summary judgment is appropriate if there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law. *Id.*

¶ 7.   Bleecker argues the circuit court erred in concluding his claim accrued when he signed the lease in 2003. The court erred, he contends, because he did not suffer any actual damage at that time and indeed would not have suffered any damage if Aurora had chosen in 2013 to extend the term of the lease for another five years instead of terminating it. Bleecker maintains that for a claim to accrue, damage has to have occurred or be "reasonably certain" to occur, and he asserts that until Aurora notified him in 2013 that it would not extend the term of the lease, any damage resulting from Cahill's alleged malpractice in 2003 was speculative, a "mere possibility." Bleecker is correct.

¶ 8.   For a claim to accrue, it must be "capable of present enforcement," which does not occur "until the plaintiff has suffered actual damage." *Hennekens v. Hoerl*, 160 Wis. 2d 144, 152, 465 N.W.2d 812 (1991). "Actual damage is harm that has already occurred or is reasonably certain to occur in the future. Actual dam-

other grounds that Bleecker's claim did not accrue until 2013, we need not address the discovery rule issue. *See Hegwood v. Town of Eagle Zoning Bd. of Appeals*, 2013 WI App 118, ¶ 1 n.1, 351 Wis. 2d 196, 839 N.W.2d 111 (we need not address other issues when one is dispositive).

age is not the mere possibility of future harm." *Id.* at 152–53 (citation omitted). Several cases guide us in our determination as to when Bleecker suffered actual damage in this case.

¶ 9. In *Meracle v. Children's Serv. Soc'y*, 143 Wis. 2d 476, 478, 421 N.W.2d 856 (Ct. App. 1988), plaintiffs adopted a child through an adoption agency, specifically requesting "a 'normal, healthy child.'" Prior to the completion of the adoption in November 1980, the agency informed plaintiffs the child's paternal grandmother had died of Huntington's Disease; however, the agency assured plaintiffs the child's father had tested negative for the disease and the child thus had no chance of contracting it. *Id.*

¶ 10. In February 1981, plaintiffs saw a television show on Huntington's Disease, which informed them there was no test to discover whether a person had the disease and that a child had a fifty percent chance of developing it if a biological parent of the child had the disease. *Id.* at 478–79. In September 1984, plaintiffs' adopted child was diagnosed with the disease, and plaintiffs filed suit alleging the agency negligently placed the child with them and misrepresented the likelihood she would develop the disease. *Id.* at 479.

¶ 11. The circuit court ruled plaintiffs' claim was time barred because it had accrued in early 1981 when plaintiffs "first learned that their adopted daughter was at significant risk of getting Huntington's Disease." *Id.* We disagreed with the circuit court, noting that the "gravamen" of plaintiffs' claim was "not the adoption of a child *at risk* of contracting the disease, but the adoption of a child who *has developed* the disease." *Id.* at 482 (emphasis added). The injury, we noted, consisted of "medical and other expenses and

damages which [plaintiffs] will endure because [the agency] negligently placed with them an unhealthy child. None of these expenses or damages could have been recovered in early 1981 when [plaintiffs] had only a fear [the child] would develop Huntington's Disease." *Id.* at 482–83. We concluded the statute of limitations did not begin to run until the child was diagnosed with the disease in September 1984. *Id.* at 483.

¶ 12. Our decision in *General Accident Ins. Co. v. Schoendorf & Sorgi*, 195 Wis. 2d 784, 537 N.W.2d 33 (Ct. App. 1995), and our supreme court's affirmance in *General Accident Ins. Co. v. Schoendorf & Sorgi*, 202 Wis. 2d 98, 549 N.W.2d 429 (1996), are also instructive. In *Schoendorf*, a law firm prepared a pension and profit sharing plan for Westridge Orthopedics in 1975. *Id.* at 101. In 1980, Westridge hired a second firm to review the plan, and this firm concluded the plan was not in compliance with the applicable law. *Id.* Westridge asked the second firm to bring the plan into compliance; however, it failed to do so. *Id.* In 1985, the IRS formally notified Westridge the plan had been disqualified for the period beginning January 1, 1975, and ending December 31, 1983. *Id.* at 101–02. The IRS subsequently imposed tax assessments against Westridge's plan for the years 1979 to 1983. *Id.* at 102. The second firm settled malpractice claims with Westridge, and in 1991 sued the first firm. *Id.* The first firm moved for summary judgment, arguing that any claims the second firm may have had for equitable subrogation were barred by the statute of limitations. *Id.* The circuit court disagreed, as did we and our supreme court.

¶ 13. On appeal to us, the first firm argued Westridge suffered actual damage "when it received 'a defective plan in 1975, even though Westridge had not

288

yet suffered any monetary loss.' " *Schoendorf*, 195 Wis. 2d at 798 n.9. We acknowledged the rule that actual damage "can occur even though there is not 'a contemporaneous monetary loss' if the plaintiff has sustained 'injury to a legal interest or loss of a legal right.' " *Id.* We concluded, however, that "the rights of Westridge in connection with its pension and profit sharing plan were not fixed until after the plan was disqualified and attempts failed to persuade the [IRS] not to, in effect, apply that disqualification retroactively." *Id.* We continued:

> In essence, although there was the potential for damage in 1975 when an allegedly defective plan was given to Westridge, and Westridge knew of that potential in December of 1980, the damage was inchoate until the plan could no longer be brought into compliance for the assessment years.

*Id.* In its review, the supreme court concluded that Westridge

> did not suffer actual damage until it was notified by the IRS in March of 1985 that its plan was disqualified; before that time, Westridge knew only that assessments against the plan were a possibility, and, as stated in *Hennekens*, "[a]ctual damage is not the mere possibility of future harm."

*Schoendorf*, 202 Wis. 2d 98 at 112 (citation omitted).

¶ 14. In *Meracle*, "medical and other expenses and damages" were only a possibility until plaintiffs' adopted daughter was actually diagnosed with Huntington's Disease. With that diagnosis, those damages became "reasonably certain to occur in the future," *see Hennekens*, 160 Wis. 2d at 152–53, and the parents became aware of that reasonable certainty. In *Schoendorf*, financial loss—assessments by the IRS—were

only a possibility until the IRS notified Westridge that its plan was disqualified. With that notification, financial assessments became "reasonably certain to occur in the future" and Westridge became aware of that.

¶ 15. Similarly, in the case now before us, Bleecker did not suffer actual damage when Cahill allegedly provided him with defective legal assistance regarding the lease or when Bleecker subsequently signed the lease without reading it in October 2003.[3] At that point, even if Bleecker had read and understood the terms of the lease, he only would have known it was a possibility he could lose the right to receive additional amortization payments from Aurora after the first ten years. He incurred actual damage when Aurora notified him in 2013 that it would not extend the term of the lease and he thus would lose five years of amortization payments. With that notification, financial loss became "reasonably certain to occur in the future" and Bleecker became aware of that reasonable certainty.[4]

---

[3] Cahill asserts that Bleecker's claim accrued in 2003 because he "lost his legal right to the guaranteed amortization payments when he signed the Lease." We disagree. As Bleecker points out, he "never had a 'right' to guaranteed payments. He had a right to be properly apprised of the potential effects of the Lease and to sign or not sign on that basis."

[4] Cahill asserts that as soon as Bleecker signed the document in 2003, he could have filed "an action for relief, including a complaint for reformation/rescission based on mutual mistake, or even specific performance." Cahill does not elaborate on or develop an argument regarding the possibility Bleecker could have proceeded on such actions. As a result, we do not address these assertions. *See State v. Pettit,* 171 Wis. 2d 627, 646, 492 N.W.2d 633 (Ct. App. 1992) ("We may decline to review issues inadequately briefed.").

¶ 16. Cahill relies heavily upon our supreme court's decision in *Hennekens*, 160 Wis. 2d 144, but we find *Hennekens* unhelpful to Cahill. In *Hennekens*, the defendant-attorney negligently drafted a land purchase agreement and promissory note by failing to include financing contingency clauses. *Id.* at 157. Significant to the case now before us, the *Hennekens* court did not conclude that actual damage to Hennekens occurred when defendant-attorney drafted those documents for Hennekens or even when Hennekens signed them. *Id.* Instead, the court stated that the defendant-attorney's failure to include the contingency clauses "harmed" Hennekens "on the date the promissory note was due," which was a month after Hennekens had signed the note and entered into the land purchase agreement. *Id.* On that due date, the court stated, "Hennekens remained liable on the note notwithstanding the fact that he had not received, and could not receive, clear title to the land." *Id.* Similarly, as stated, in this case, Cahill's alleged negligence in assisting Bleecker actually harmed Bleecker when Aurora notified him that it would not extend the term of the lease. With that notification, Bleecker became aware he would remain liable for the total cost of the building yet it was reasonably certain he would not be receiving further offsetting amortization payments from Aurora.

¶ 17. Cahill contends "it is immaterial whether a suit in 2003 against Cahill and/or against Aurora/ Cahill would have been successful or not" because the statute of limitations begins to run even where the merits of a claim are in question. However, the question for statute of limitation purposes is not whether a suit in 2003 ultimately would have been successful; the question is whether Bleecker had a claim at that point that was "capable of present enforcement." *See id.* at

152. Here, Bleecker did not have a claim capable of enforcement in 2003. If Aurora had exercised its option after the first ten years to extend the term of the lease, Bleecker would have suffered no harm. Cahill has identified no evidence of record indicating there was a reasonable certainty at the time Bleecker signed the lease—or at any time prior to Aurora's 2013 notification—that Aurora would not extend the lease and continue making the amortization payments. Without such evidence, the prospect that Bleecker would suffer harm was just a "mere possibility" and remained so until Aurora notified Bleecker that it would not extend the term of the lease. As a result, the statute of limitations did not begin to run on Bleecker's claim until 2013 and his claim was timely filed.

*By the Court.*—Order reversed and cause remanded.